## SOUTHERN UNDERWRITERS v. PAGE.

### No. 3310.

Court of Civil Appeals of Texas. Beaumont.
June 10, 1938.

Rehearing Denied June 22, 1938.

Battaile, Burr & Holliday, of Houston, for plaintiff in error.

Howth, Adams & Hart, of Beaumont, for defendant in error.

WALKER, Chief Justice.

This is a compensation case, filed in the district court of Jefferson County by appellee, I. C. Page, defendant in error, against appellant, The Southern Underwriters, plaintiff in error, as an appeal from an adverse award of the Industrial Accident Board. Appellant was the compensation insurance carrier; appellee, the employee; and Southern Lumber Company, the employer. The trial was to a jury, and by its verdict it found the following controlling facts: On or about the 29th of March, 1936, while "engaged in the usual course of the trade, business, profession or occupation of his employer", that is, while he was engaged in "tightening bolts on a hinge on the door of a dry kiln", appellee sustained a personal injury. The injury—"a break in bone of his left foot and injury to the ligaments, tendons and nerves in his right foot and leg"—"was caused by his falling on a ladder upon which he was standing". The injury "was an accident", and has caused appellee to "suffer pains which extended from the leg and up into the spinal portion" of his body, and "was sustained in the course of his employment with the Southern Lumber Company". It was further found that, as a proximate result of the personal injury suffered by appellee on the 29th day of March, 1936, while in the course of his employment with Southern Lumber Company, he suffered permanent, total disability, and that an injustice would result to him if he were denied "a lump sum settlement". On the verdict of the jury, judgment was entered in appellee's favor for the sum of $5,727.41, with interest at six per cent per annum from the 12th day of June, 1937, the date of the judgment, and all costs of suit. From the judgment appellant has duly prosecuted its appeal to this court, and thus states the issue of the appeal:

"The only question involved in this appeal is whether or not the plaintiff, I. C. Page, at the time of his injury was engaged in the usual occupation of his employer, Southern Lumber Company."

In explanation of the point at issue we make the following statement from the record:

"B. M. Jackson, vice president of the Southern Lumber Company, testified in part as follows:

"We (Southern Lumber Company) are engaged in manufacturing and wholesaling lumber. On March 29, 1936, we were engaged in the building of a dry kiln at the plant. The purpose of building this dry kiln was to increase our capacity. I have been in the saw mill business indirectly for ten years, but directly for about six or seven. I am acquainted with sawmills over this part of Texas, Southeast Texas, and the equipment of them. All of the larger mills have dry kilns, but many of the smaller mills don't have them. I wouldn't say all mills have dry kilns, but nearly all.

"Q. A dry kiln in a company as large as yours is just a part of the equipment of the mill? A. I know of others that didn't have them; nearly always they build them as soon as they get the money to do it.

"Q. They install better machinery when they get the money? A. Certainly.

"Q. It makes a better mill; I don't mean that you can't run a mill without it. A. That's the idea I was trying to convey.

"Q. All the mills that are able to have those dry kilns, and the purpose is what? A. To dry the upper grade lumber.

"Q. And that is solely to facilitate getting the lumber on to the market, isn't it? A. Well, that's partly it, and then partly because it dries a great deal faster that way, and doesn't require so much investment in lumber.

"Q. Your turn over is faster? A. That's right.

"Q. You get it out of the mill, get it into the kiln, dry it and sell it? A. That's right.

"Q. Whereas, if you have to stand it in the sun, maybe one day, and rain the next, you can't tell when it is going to dry? A. Yes, sir.

"Q. You can't get it to the lumber yard until it is dry? Can you? A. No, sir.

"Q. I want to know whether or not the building of those dry kilns, erecting of them and maintenance, keeping them up, is a part

of the business of manufacturing and retailing lumber?

"Mr. Battaile: I object to it, Your Honor, on the ground that it is a double question.

"Q. All right, I'll break it up. I don't want to confuse you and I don't want to become confused. I say, in the manufacture of lumber and timber products, as it is carried on by the Southern Lumber Company at its mill here in Beaumont, isn't the maintenance of a dry kiln an essential part of the operation of the business of the Southern Lumber Company here in the manufacture of lumber and timber products? A. As we carry it on, it is.

"Q. And as you were carrying it on in November, 1936; you had a dry kiln in operation out there? A. In November, 1936, yes sir.

"Q. And this was also true of March 29, 1936? A. Yes.

"Q. And did you also have a dry kiln in operation out there at your plant in November, 1935? (Effective dates of policy, beginning November 28, 1935, expiring November 28, 1936) A. Yes, sir.

"Q. Now, I'll ask you, as you conducted the business of the Southern Lumber Company here at the mill at Beaumont, manufacturing lumber and timber products, was it a part of that business to build that dry kiln? A. I would still like to qualify.

"Q. All right. A. Well, I mean it is no more a part than any other building you would have, the saw mill or anything else; you wouldn't have to build it; we had kilns already in operation.

"Q. But good business dictated you to building it out there? A. We expected to profit by it.

"Q. Just as good business directed you to install a new boiler, or a new saw, or different equipment in the mill? A. That's a little bit different, because we change that kind of stuff constantly.

"Q. You only build a dry kiln when you want to expand your business. A. Those we had stayed there about fifteen or sixteen years.

"Q. Have you got machinery some of it that lasts that long, too? A. Yes.

"Q. Machinery in the mill that is used for making wood? A. Some of it last that long."

Plaintiff's witness, W. H. Thornton, testified in part as follows:

"Q. Do you know whether or not a dry kiln is a part of the general system of a saw mill? A. Yes, sir.

"Q. Do you know whether or not a dry kiln is necessary for sawmill work? A. Yes, sir.

"Q. You say a dry kiln is necessary to a sawmill? A. Yes, sir; to the up-to-date sawmill.

"Q. Oh, it is to the up-to-date saw mill now? A. The way they run lumber through them, I think it would be a necessity."

Plaintiff, I. C. Page, testified as follows:

"On or about the 29th day of March, 1936, I was working for the Southern Lumber Company in Jefferson County, in the City of Beaumont, at which time I sustained an injury. I was working for the company on a dry kiln inside of the building and I was up on top of a ladder. The ladder wasn't built as well as it could have been. I was standing on top of the ladder might near straight up with a nigger supposed to be holding this ladder while I put a nut on a bolt up there with an open end wrench. I had been working at this dry kiln for ten days. Every sawmill that I was ever around had a dry kiln. I was employed by the Southern Lumber Company to work on this dry kiln and this is all the work that I have ever done for them. I am a contractor by trade. They had about ten or twelve carpenters working on this dry kiln. The brick work was in place at the time of my accident. I was working on the inside where other carpenters were also working. On the day of my injury I was helping swing a door near the top of the ceiling, and in so doing was up on a ladder.

"Q. How long have you been working at sawmills off and on during your life? A. I worked for that one ten days.

"Q. Do you know what a dry kiln is? A. I do.

"Q. Tell the gentlemen of the jury as to whether or not it is a part of a sawmill system? A. Well, every sawmill I ever was around, they had one.

"Q. Yes, sir. A. And they operated them; I was employed there to work on that dry kiln; and that was all that I ever worked for those people.

"Q. The insurance company in this case we allege to be the Southern Underwriters. Have they or have they not paid you some compensation? A. Yes, sir.

"Q. What was the weekly amount, or the compensation wage rate that they paid you? A. $17.31 a week.

"Q. Say that again. A. $17.31 a week.

"Q. And did they pay you one payment or more than one payment? A. More than one.

"Q. Where did you get your check? A. I got them, a part of them, out at the Southern Lumber Company office; I think two I got out there. The balance, the claim agent brought them to me.

"Q. Now, then how much did this insurance company the Southern Underwriters pay you all told on account of this industrial accident? A. $259.69, or 65 cents or something like that I think.

"Q. About how much? A. $259.65 or 69 cents; somewhere in that manner, or about that.

"Q. Now, let me see about how long after this accident was it that this insurance company gave you the first check, if you remember? A. Three weeks, I think.

"Q. And another thing they did was to send you to Dr. Pierson; is that true? A. Yes, sir."

The facts of this case are controlled by Traders' & Gen. Ins. Co. v. Powell, Tex. Civ.App., 44 S.W.2d 764; Commission of Appeals' opinion on first appeal, 65 S.W.2d 269; second opinion of Court of Civil Appeals, 82 S.W.2d 747; opinion of Commission of Appeals on second appeal, 110 S.W. 2d 559. Writing the opinion for the Commission of Appeals on the second appeal, Judge German quoted the following statement from the opinion of the Court of Civil Appeals on the second appeal (page 560):

"The employer, Tenaha Compress & Warehouse Company, was engaged in the operation of a cotton compress and the storage of cotton in the town of Tenaha, Shelby county, Texas. A few days prior to June 30, 1930, appellee, Chester L. Powell, was employed by the compress company as a general laborer, and began work along with the other employees of the company in making repairs of the property. It appears from the evidence that the compressing season had closed and no cotton had been compressed for a month or more. But the plant was prepared to receive and store cotton, and some was then in storage. The employees were engaged in making needed repairs and putting the plant in condition for the fall business. For a day or two after Powell went to work he and the other employees worked at tearing up and replacing flooring in the plant. The manager, Mr. E. W. Muckleroy, then directed the employees to go to Center, Tex., about 10 miles distant, and dismantle a steel water tank and tower which had been purchased secondhand, remove it to Tenaha, and re-erect it on the premises of the compress. The old water tank then in use at the plant was inadequate to furnish a sufficient supply of water for the boilers, and was practically worn out. Also it did not afford sufficient water or water pressure for fire protection for the plant and the cotton in storage. This resulted in high insurance rates on the stored cotton. It seems that such insurance was paid by the owners of the cotton, and Mr. Muckleroy testified that the high insurance rates threatened serious curtailment of the business of the compress. The secondhand water tank and tower had been purchased with the view of supplying the plant with adequate water for all purposes. All employees of the company from the manager on down, went to Center, as directed, and began the work of tearing down the water tower. After they had been working about four days, Powell fell from the tower to the ground, a distance of about 60 feet, and as a result was very seriously injured. It is not disputed that he is totally and permanently disabled."

Appellant made the point on both appeals that, at the time of his injury, Powell was not engaged in the "usual course of trade, business or occupation of his employer". Disposing of that point, Judge German said:

"It is strenuously urged that at the time plaintiff was injured he was not engaged in the 'usual course of trade, business or occupation of his employer.' Upon this contention we are instructed by the Supreme Court to say that this question was necessarily involved on the former appeal, and, although not discussed, was decided against plaintiff in error; and that decision will not again be reviewed."

On authority of the Powell Case it is our conclusion that the facts raised the issue, and were sufficient to support the jury's finding, that at the time of his injury Page was engaged in the "usual course of trade, business or occupation of his employer".

Judgment of the lower court is in all things affirmed.

Affirmed.